# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| NASHID AKIL | : | CIVIL ACTION |
| Plaintiff, | : | NO. 23-2654 |
|  | : |  |
| -vs- | : |  |
|  | : |  |
| CITY OF PHILADELPHIA | : | PLAINTIFF REQUESTS |
| (PHILADELPHIA POLICE | : | A TRIAL BY JURY |
| DEPARTMENT) | : |  |
| and | : |  |
| FRANCIS HEALY | : |  |
| and | : |  |
| RICHARD STEIN | : |  |
| and | : |  |
| DANIEL OUTLAW | : |  |
| and | : |  |
| ROBIN WIMBERLY | : |  |
| and | : |  |
| JOEL DALES | : |  |
| and | : |  |
| MICHAEL COCHRANE | : |  |
| and | : |  |
| YVONNE BANKS | : |  |
| and | : |  |
| JOHN STANFORD | : |  |
| Defendants. | : |  |
|  | : |  |

Plaintiff, Nashid Akil ("Mr. Akil" or "Plaintiff"), by and through undersigned counsel hereby files this Civil Action Complaint against Defendants, City Of Philadelphia Francis Healy, Richard Stein, Daniel Outlaw, Robin Wimberly, Joel Dales, Michael Cochrane, Evan Banks, and John Stanford (collectively "Defendants") and avers the following:

## PARTIES

1.  Plaintiff, Nashid Akil ("Mr. Akil" or "Plaintiff") is an adult male who resides in the Commonwealth of Pennsylvania, within the City and County of Philadelphia.

2.      Defendant, City of Philadelphia ("City" or "PPD" or "Defendants") is a municipal corporation organized and existing under the laws of the Commonwealth of Pennsylvania with an address for the purposes of service at  1515 Arch Street, Philadelphia, Pennsylvania 19103.

3.      Defendant, Francis Healy ("Healy" or "Defendants") is an adult male who was employed by the City of Philadelphia, and subjected Plaintiff to violations of Plaintiff's rights as more fully set forth below.

4.      Defendant Francis Healy held the position, Staff Inspector, which is a supervisory position.

5.      Defendant, Francis Healy also held the title Legal Advisor to the Police Commissioner, and used his position to subject Plaintiff to violations of Plaintiff's rights under color of state law.

6.      Defendant, Richard Stein ("Stein" or "Defendants") is an adult male who was employed by the City of Philadelphia, and subjected Plaintiff to violations of Plaintiff's rights as more fully set forth below.

7.      Defendant Richard Stein held the position, Sergeant in the Department of Internal Affairs, which provided a human resources function for the City of Philadelphia, including investigating personnel issues during Plaintiff's employment for Defendants.

8.       Defendant, Daniel Outlaw ("Outlaw" or "Defendants") is an adult female who was employed by the City of Philadelphia, and subjected Plaintiff to violations of Plaintiff's rights as more fully set forth below.

9.      Defendant Daniel Outlaw held the position, Police Commissioner, during Plaintiff's employment for Defendants.

10.     Defendant, Robin Wimberly ("Wimberly" or "Defendants") is an adult female who was employed by the City of Philadelphia, and subjected Plaintiff to violations of Plaintiff's rights as more fully set forth below.

11.     Defendant Robin Wimberly held the position, Deputy Police Commissioner, during Plaintiff's employment for Defendants.  Specifically, Defendant, Robin Wimberly was the Deputy Police Commissioner of Internal Affairs.

12.     Defendant, Joel Dales ("Dales" or "Defendants") is an adult male who was employed by the City of Philadelphia, and subjected Plaintiff to violations of Plaintiff's rights as more fully set forth below.

13.     Defendant Joel Dales held the position, Deputy Police Commissioner, during Plaintiff's employment for Defendants.  Specifically, Defendant, Joel Dales was the Deputy Police Commissioner of Patrol.

14.     Defendant, Michael Cochrane ("Cochrane" or "Defendants")  is an adult male who was employed by the City of Philadelphia, and subjected Plaintiff to violations of Plaintiff's rights as more fully set forth below.

15.     Defendant Michael Cochrane held the position, Chief Inspector, during Plaintiff's employment for Defendants.

16.     Defendant, Yvonne Banks ("Banks" or "Defendants")  is an adult female who was employed by the City of Philadelphia, and subjected Plaintiff to violations of Plaintiff's rights as more fully set forth below.

17.     Defendant Yvonne Banks held the position, Manager of Personnel, during Plaintiff's employment for Defendants.

18.     Defendant, John Stanford ("Stanford" or "Defendants") is an adult male who was employed by the City of Philadelphia, and subjected Plaintiff to violations of Plaintiff's rights as more fully set forth below.

19.     Defendant John Stanford held the position, Inspector of Internal Affairs, during Plaintiff's employment for Defendants. Sometime around September 2022, Defendant, John Stanford was promoted to Deputy Police Commission of Field Operations.

20.     At all times relevant to this Civil Action, Defendants acted under color of state law, as employees for the City of Philadelphia, and subjected Plaintiff to violations of his rights afforded to Plaintiff by the United States Constitution  including but not limited to Plaintiff's right to equal protection under the law and due process.

## NATURE OF THE CASE

21.     Plaintiff complains pursuant to 42 U.S.C. § 1983 based upon the continuing violations of Plaintiffs' rights under the First, Fifth and Fourteenth Amendments to the United States Constitution and seeks damages to redress injuries Plaintiff suffered as a result of violations of Plaintiff's rights afforded by the United States Constitution, including the right to equal protection under the laws.

22.     Plaintiff also complains pursuant to the 42 Pa.C.S. § 1421, et seq., the Pennsylvania Whistleblower Law and Pennsylvania's Common-law Wrongful Termination Statute.

## JURISDICTION AND VENUE

23.     This action involves a Question of Federal Law under 42 U.S.C. § 1983.

24.     The honorable Court also has supplemental jurisdiction over any claims pursuant to the laws of the Commonwealth of Pennsylvania and/or the City of Philadelphia.

25.     Venue is proper in the Eastern District of Pennsylvania as Plaintiff was employed by Defendants and worked in Philadelphia County where the constitutional violations of Plaintiff's rights occurred.

26.     Plaintiff also intends to include counts for violations of Title VII of the Civil Rights Act of 1964, the Pennsylvania Human Relations Act ("PHRA"), and the Philadelphia Fair Practices Ordinance ("PFPO"), once Plaintiff has exhausted his administrative remedies and obtains the right to file suit in court pursuant to federal, state, and local antidiscrimination laws.

27.     Plaintiff's lawsuit under Section 1983 must be filed so Plaintiff preserves all rights at this time, however, Plaintiff also intends to file a Charge of Discrimination with the EEOC, dual filed with the Pennsylvania Human Relations Commission and the Philadelphia Commission on Human Relations, pursuant to all acts that occurred within the statutory period for such filing.

28.     Plaintiff intends to file an amended complaint as early as possible and once he has exhausted his administrative remedies.

## **MATERIAL FACTS**

29.     Plaintiff, Nashid Akil was employed by the City of Philadelphia, Philadelphia Police Department ("PPD" or "Defendants") when Plaintiff was unlawfully terminated from his employment.

30.     Plaintiff began his employment for Defendant, PPD sometime around April 2000, when Plaintiff was twenty (20) years old.

31.     Plaintiff dedicated his career to diligence and hard work and rose through the ranks of the Philadelphia Police Department from the age of twenty (20 years old) until Plaintiff was unlawfully terminated from his employment at the age of forty-three (43).

32.     Defendants unlawfully terminated Plaintiff's employment on or around February 8, 2023.

33.     Plaintiff's employment ended when Defendants informed Plaintiff that Plaintiff had only two choices: (1) wait for an imminent termination which would result in Plaintiff losing his entire pension, which Plaintiff had worked to earn for approximately twenty-three (23) years, or (2) resign from his position as Captain.

34.     Plaintiff, Nashid Akil was not accorded any other options other than resign or lose his entire pension.

35.     Plaintiff will begin receiving pension benefits without any penalty at the age of fifty (50).   At that time, Plaintiff's pension benefits are valued at approximately $6,000 per month, or $72,000 per year.

36.     The life expectancy for a male in the United States is 77.28.   Therefore, it is foreseeable that Plaintiff will receive pension benefits from the age of fifty (50) until the age of seventy-seven (77) at a rate of approximately $6,,000 per month.

37.     Accordingly, Defendants threatened to take approximately $1,944,000 from Plaintiff and Plaintiff's family, when Defendants threatened to terminate Plaintiff's employment.

38.     Defendants put Plaintiff on a clock with a termination deadline.

39.     Plaintiff received a communication from the Philadelphia Police Department, informing Plaintiff that Defendants and Defendant, Outlaw, had made the decision to terminate Plaintiff's employment.

40.     On or around February 6, 2023, Plaintiff was notified that Plaintiff would be terminated by February 8, 2023.

41.     At that time, Plaintiff made the decision to retire by contacting personnel and completing paperwork that effectively and prematurely ended Plaintiff's employment for Defendants.

42.     Plaintiff was scheduled for termination February 8, 2023, and Plaintiff early retirement was not a free will decision.  Any reasonable person in Plaintiff's position would have elected a voluntary retirement under those circumstances.

43.     Defendants notified Plaintiff that Plaintiff had until February 8, 2023, to decide whether Plaintiff wanted to lose his pension, because Plaintiff's termination date was scheduled for February 8, 2023.

44.     Defendants have a pattern and practice of forcing employees to retire early due to retaliatory animus in order to make an example out of employees who report violations of the law including but not limited to reports of unlawful conduct, unlawful comments, discrimination, retaliation, sexual harassment, fraud, waste, wrongdoing.

45.     Defendants have demonstrated a pattern and practice of forcing employees including Plaintiff to leave their careers early in order to avoid adverse action including loss of a pension and employment.

46.     Plaintiff worked for approximately twenty-three (23) years in order to accumulate a pension that afforded Plaintiff security during Plaintiff's retirement age.

47.     Plaintiff, Nashid Akil was subjected to a suspension with intent to dismiss, due to Defendants' retaliatory animus and Defendants pattern and practice of subjecting employees who report violations of the law to retaliation.

48.     The Vice President of FOP, John McGrody, called Nashid Akil on February 6, 2023, at approximately 4:00 P.M., and informed Nashid Akil that Mr. Akil was scheduled to be terminated Thursday, February 8, 2023, at 11:00 A.M.

49.     Defendants subjected Nashid Akil to a termination by intentionally placing Nashid Akil in a position where any reasonable person within those circumstances would have agreed that there was no actual decision and the choice to submit a resignation was void of free will.

50.     Nashid Akil chose to protect the pension that Nashid Akil worked approximately twenty-three years to accumulate.

51.     Throughout Nashid employment, Nashid was subjected to discrimination due to race.

52.     Nashid Akil was subjected to disparate treatment and retaliation due to Nashid Akil reporting waste and wrongdoing.

53.     Nashid Akil was subjected to disparate treatment and retaliation due to Nashid Akil exercising his rights under the First Amendment of the United States Constitution and speaking out about fraud and waste within the City of Philadelphia.

54.     Nashid Akil was subjected to disparate treatment and retaliation due to Nashid Akil's race.

55.     Nashid Akil was subjected to disparate treatment and retaliation due to Nashid Akil engaging in protected activity by reporting discrimination and harassment in the workplace.

56.     Nashid Akil exercised his rights under the First Amendment of the United States Constitution when Nashid Akil spoke up about how the police was treating the community and specifically vulnerable members of the community.

57.     Nashid Akil started a program called Guns Down Gloves Up.

58.     This program was held in front of the 22nd Police District where Nashid Akil taught the youth not to overreact during high stress situations.

59.     The program's mission was that younger members of the Philadelphia community should not resort to gun violence to resolve disputes and arguments.

60.     The primary objective of the Guns Down, Gloves Up program was to teach the City's Youth not to turn to gun violence as a first option and to consider far less violate alternatives that would not end in the loss of life.

61.     Nashid Akil began this program around June 2020.

62.     Defendants denied Nashid Akil the opportunity to receive a DROP through the DROP program because Mr. Akil was given less than forty-eight (48) hours to leave the PPD forever, or face unlawful termination.

63.     DROP is an acronym that stands for Deferred Retirement Option Plan, and gives city employees the option of increasing pension benefits through market investment.

64.     After nearing twenty-three (23) years of employment for the City of Philadelphia, Defendants forced Plaintiff, Nashid Akil to discontinue his employment forever and Nashid Akil was given two days' notice as part of the threat of termination.

65.     Plaintiff, Nashid Akil was promoted up the ranks of the Philadelphia Police Department and reached the rank of Captain, which is the position Nashid Akil held at the time of his unlawful termination.

66.     Plaintiff was the Captain of the Twenty-Second (22nd) Police District.

67.     In his position as Captain, of the Twenty-Second (22nd) Police District, Nashid Akil was responsible for managing police officers, corporals, sergeants, and lieutenants.

68.     Lieutenant Wood ("Wood") was assigned to the 22nd Police District and was one of the Lieutenants that Captain Nashid Akil was responsible for managing.

69.     Sergeant James Tucker ("Tucker") was also assigned to the 22nd Policy District and was one of the Sergeants that Captain Nashid Akil was responsible for managing.

70.     Sometime around April 8, 2020, Captain Nashid Akil was notified by Lieutenant Wood that Sergeant James Tucker had called out sick.

71.     Nashid Akil confirmed the information that Sergeant James Tucker was calling out of work due to reports of being sick.

72.     April 8, 2020, was approximately one month after the COVID19 pandemic began to significantly impact employees and employers throughout the United States, including Philadelphia, Pennsylvania.

73.     Approximately two days after calling out sick, Sergant Tucker reported that he had contracted the COVID19 virus.

74.     At the time the PPD's policy for COIVD relief and COVID relief funds was called "E-COVID".

75.     The E-COVID policy provides employees with fourteen (14) days off from work, for "quarantine time" before they can return to active duty.

76.     Employees who report fever or other symptoms must be sent home immediately and quarantine subject to the E-COVID policy.

77.     The fourteen (14) day quarantine time was mandatory for employees who reported symptoms.

78.     Employees who reported that they contracted the virus received paid time off during the fourteen (14) day quarantine time such that they did not have to utilize their saved up and/or accumulate sick and/or vacation time.

79.     This E-COVID policy was subject to abuse, waste, fraud, and wrongdoing, to the detriment of the City of Philadelphia and the taxpayers, because there was no system in place for confirmation of whether there was actually a need for employees to require fourteen (14) paid days off from work.

80.     Any employee who wanted a two-week paid vacation could take advantage of the E-COVID policy without any question or confirmation that the employees actually needed time off from work.

81.     Employees were not required to provide a positive COVID19 test, or even a doctor's note.

82.     The system was ripe for fraud, abuse, and waste and City employees constantly used the E-COVID policy to receive paid time off.

83.     The City did not require any confirmation, doctor's note or positive test before an employee could return to active duty.

84.     Sometime around April 8, 2020, Captain Nashid Akil was notified that Sergeant Tucker was going to use the E-COVID policy and take fourteen (14) days off from work.

85.     Sergeant Tucker did not return to work after the 14 days.

86.     After the fourteen (14) days Tucker remained out of work without any doctor's note or confirmation that Tucker was actually sick or required time off from work.

87.     Tucker did not provide a doctor's note, or any confirmation that Tucker required time off due to injury or sickness.

88.     After the fourteen (14) days provided by the ECOVID policy,  Tucker reported that he was not returning to active duty.

89.     Sergeant Tucker continued to receive full pay for the time Tucker was not at work, long past the fourteen (14) day, time period provided by the E-COVID policy.

90.     Tucker did not use his sick or vacation time but instead continued using the E-COVID policy to remain out of work with full pay.

91.     The first fourteen (14) days when Tucker called out of work was sometime around April 8, 2020 until approximately April 22, 2020.

92.     These fourteen days was purportedly covered through the E-COVID quarantine policy.

93.    Tucker remained out of work for twenty-nine (29) days and was scheduled to return to active duty on Monday, May 18, 2020.

94.    According to the City's policy, days are counted in terms of days when the employee is schedule to work, and days when the employee is not scheduled to work are not counted.

95.    Tucker did not return to work for approximately forty (40) days and received pay for twenty-nine (29) days through the City's COVID19 relief funds and the E-COVID policy.

96.    While Sergeant Tucker was on this leave, Lieutenant Wood retired.

97.    Lieutenant Wood's successor was Lieutenant Landherr.

98.    Lieutenants in the City of Philadelphia Police Department report to the Captain in the police district where they are assigned.

99.    Lieutenants are assigned police squads to oversee and manage.

100.    Landherr reported that Tucker scheduled a return to active-duty date for May 18, 2020.

101.    Within days of Tucker's May 18, 2020, scheduled return date, Nashid Akil saw Sergant Tucker at a car wash actively washing his car, looking healthy, and around other people without social distancing and without a mask.

102.    Tucker was not wearing a mask and was actively washing his car, with music playing loudly, and appearing to enjoy the day.

103.    Therefore, Plaintiff, Nashid Akil was surprised when Tucker's May 18, 2020, return date arrived, and Sergeant Tucker did not return to work as scheduled.

104.    Nashid Akil asked Lieutenant Landherr to look into it, and Lieutenant Landherr informed Captain Nashid Akil that Sergant Tucker reported that he was remaining out of work due to sickness.

105.    The entire time, Tucker continued to receive full pay in excess of any sick time or vacation time earned through the City's COVID19 relief funds.

106.    Tucker remained out of work without any doctor's note or medical documentation, and used the City's E-COVID policy, funded through taxpayer dollars, to receive full pay and benefits the entire time.

107.    Accordingly, Nashid Akil followed well-established policies and procedures by contacting the department's legal advisor who was Defendant, Francis Healy at that time.

108.    Nashid Akil explained the situation related to Tucker's absence from work, and ongoing sick leave, covered under the City's E-COVID policy, to Defendant, Healy.

109.    Tucker was nearly two months out of work at full pay, and according to what Captain Akil witnessed at the carwash, it appeared that Tucker was refusing to work when healthy and using the COVID19 pandemic to subsidize his extended vacation.

110.    This constitutes fraud, waste and wrongdoing and Captain Nashid Akil first reported this to the City's legal advisor, Defendant, Francis Healey.

111.    Captain Nashid Akil explained that the City's E-COVID policy was ripe for abuse, waste and wrongdoing, and that Tucker was going on two months of leave without any confirmation of being sick, far in excess of the fourteen (14) days provided by the E-COVID policy.

112.    Sergeant James Tucker provided no documentation to confirm any medical issue.

113.    Tucker continued to remain out of work, reporting that he was sick, while being paid through the City's E-COVID policy.

114.    Tucker remained out of work under these circumstances for more than one (1) year.

115.    Sergeant James Tucker received full pay through the City's E-COVID policy the entire time Tucker refused to work. This continued for more than one year.

116.    There is no indication that Tucker was ever sick, even in the first 14 days of his reported medical leave.

117.    Nahid Akil called and spoke with Defendant, Francis Healey, sometime around May 18, 2020.

118.    Defendant, Francis Healey agreed with Nashid Akil, that it appeared that Tucker was taking advantage of the COVID19 pandemic.

119.    Healy and Akil agreed that if Tucker remained out of work, he should do so at his own expense, by using sick or vacation time, and not at the expense of the public taxpayers.

120.    As of May 19, 2020, Nashid Akil began carrying Tucker's leave as sick time and Nashid Akil reported this to Mr. Akil's direct supervisor at that time who was Inspector Walt Smith.

121.    Sergeant Tucker was an adult male who held a supervisory position within the PPD, and knew or should have known that he should keep in contact with his employer in connection with his extended and purported medical leave.

122.    Captain Nashid Akil expected Sergant Tucker to contact his district and provide notification of Tucker's intentions regarding a return to work.

123.    Tucker did not check-in and continued to remain out of work without contact or report.

124.    Month after month passed and Tucker just remained out of work.

125.     On May 2020, George Floyd was murdered by Minneapolis, Minnesota police officers.

126.    This incident significantly impacted police enforcement in the United States.

127.    Sergeant Tucker's time off from work and fraud, waste, or wrongdoing in connection with the City's COVID relief were supplanted by riots within the City of Philadelphia.

128.    Police enforcement in the City of Philadelphia was chaotic and Nashid Akil worked twelve-to-sixteen-hour days to keep-up with the demand.

129.    The next incident that impacted City of Philadelphia policing was the Walter Wallace incident.

130.    By January 2021, Tucker still had not returned to work.

131.    At the beginning of each year the training bureau provides a list people who did not qualify to continue policing because they did not complete their annual requirements.

132.    Tucker did not qualify because he did not work for almost the entire 2020 year.

133.    Nashid Akil received written instructions to notify Tucker that he did not qualify for active duty and to retrieve Tucker's department issued firearm.

134.    Administrative Sergeant Dana Bradley, who is today a Lieutenant, asked Tucker to visit the district and turn-in his firearm.

135.    February 4, 2021, is the date when Brandley contacted Tucker and asked Tucker to turn-in his City firearm.

136.    February 8, 2021, Tucker arrived at work in full uniform, appearing to be ready to work.

137.    Tucker acted surprised when he was told that he could not work due to not completing the annual training requirements.

138.    Brandley notified Tucker that Tucker was not able to return to active duty because Tucker did not complete his annual training.

139.    Brandley instructed Tucker to visit 19th and Fairmount in order to obtain a medical clearance.

140.    "T-Sick" is the name of the policy that requires police officers to return to work within fifteen (15) days of running out of sick time.  If a police officer does not return to work

within 15 days of running out of sick time, the requirement is that the Captain of the Police District where the officer is assigned must send a memorandum through the chain of command suggesting that the officer abandoned his employment.

141.    When Captain Akil calculated that Tucker had used all his sick time, Akil contacted Defendant, Yvonne Banks to notify Banks of Tucker's expiration of sick time and refusal to return to work.

142.    Banks instructed Akil to send the memorandum through the chain of command informing the chain of command that Tucker had used all his sick time, remained out of work for an additional 15 days, and still was not returning to active duty.

143.    Banks later submitted false and misleading information about Akil's memorandum and Tucker's refusal to return to work, as part of the campaign of retaliation to which Plaintiff was subjected by Defendants, including Defendant, Banks.

144.    Tucker stated in words or substance, "I was really sick.  What's going on – I was really sick."

145.    Tucker had to turn-in his department issued firearm.

146.    For the next several days Lieutenant Landherr attempted to contact Tucker.  Tucker refused to respond to or return calls.

147.    Several more days passed, and Nashid Akil received no communication from Tucker  regarding intentions to return to work.

148.    Then, Lieutenant Landherr received a subpoena from internal affairs ("IA").

149.    It was Plaintiff's understanding at the time, that Defendant, Richard Stein from Internal Affairs was now investigating issues related to Tucker's more than one year off from work without any medical documentation and little to no contact or communication.

150.   Police Commissioner Daniel Outlaw instructed the Deputy Police Commissioner Robin Wimberly to look into this situation regarding Captain Akil's reports and protected activity and Sergeant Tucker's extended leave from work and refusal to return to active duty.

151.   Instead of investigating Tucker, the Defendants and the individual Defendants began a campaign of retaliation to which Plaintiff, Captain Nashid Akil was subjected, that led to Captain Akil's unlawful termination from employment.

152.   Captain Akil acted to protect the City of Philadelphia from fraud, abuse and waste, related to COVID19 relief funds.

153.   Captain Akil reported that the City's policy was ripe for abuse and led to fraud, abuse, and waste in the form of money being stolen by employees who sought to use COIVD relief money to fund extended vacations.

154.   In response to Captain Akil's reports of abuse of the policy, Captain Akil was subjected to retaliation and termination.

155.   Lieutenant Landherr was instructed to report to the PPD's Internal Affairs ("IA") department.

156.   IA informed Landherr that the target of the investigation was Captain Nashid Akil.

157.   Landherr was interviewed by IA on June 23, 2021.

158.   Landherr left the meeting with IA distressed and confused, and immediately notified Captain Nashid Akil that IA was investigating Akil.

159.   June 25, 2021: Nashid Akil spoke with Landherr, and Landherr notified Nashid Akil that Landherr was distressed due to the information Landherr was just told by IA, that Nashid Akil was the target of an IA investigation.

160.   Nashid Akil called Captain Pasquale Agozzino and reported concerns about Richard Stein.

161.    Agozzino asked for a written memo which Nashid Akil drafted.  The written member includes reports of (1) disparate treatment, (2) hostile work environment, (3) prejudice, and (4) violation of the City's EEO policy.

162.    The July 7, 2021, Memo was provided to the City by Captain Akil, through Captain Agozzino.

163.    Captain Agozzino sent the memo to Deputy Police Commission, Defendant, Robin Wimberly.

164.    Wimberly sent an email to Nashid Akil and Deputy Commission Joel Dales on July 7, 2021.

165.    November 2021: Captain Akil is interviewed by IA.

166.    The November 2021 interview with IA lasted about three (3) hours.

167.    Nashid Akil reported that his objective was to protect the City of Philadelphia from fraud, abuse and waste of COVD19 relief funds.

168.    Nashid Akil explained that the system that was ripe for abuse.

169.    December 2021:  Promotions were imminent including promotions from Police Captain to Inspector.

170.    The next step in the career of a PPD Police Captain is to be promoted to Inspector.

171.     Captain Nashid Akil was one of the youngest PPD Police Captains and the next logical step in Captain Akil's career was to be promoted to Inspector.

172.    On or around, December 10, 2021, there is a meeting held in reference to individuals eligible for promotion.

173.    Nashid Akil was one of these individuals.

174.    Nashid Akil passed his pre-promotion interview which is a step in the promotion process.

175.     Nashid Akil interviewed with two (2) Inspectors and the Chief Inspector and passed these interviews.

176.     The Chief Inspector at that time was Michael Cochrane.

177.     Michael Root was on the board, so he was one of the Inspectors present during the pre-promotion interview.

178.     Nashid Akil was clearly eligible for promotion and the interview was therefore relatively short.

179.     At that time, there were seven (7) positions available for Captains to be promoted to Inspector.

180.     The final decision regarding promotions goes to Deputy Commissioners, including Defendant, Robin Wimberly.

181.     It also includes the other deputy commissioners, and the list of promotions was finalized by these deputy police commissioners.

182.     While finalizing the list, Deputy Commissioner Wimberly said that Nashid Akil cannot be promoted because of an "open investigation" into Nashid Akil.

183.     Nashid Akil was one of the top three (3) individuals in a list of multiple candidates.

184.     There were about fifty (50) names and Nashid Akil was one of the top three (3).

185.     Nashid Akil was not even considered due to the City's retaliatory position and because of Wimberly stating that Nashid was not illegible for consideration.

186.     Nashid Akil's current income would have significantly increased had Defendants not engaged in retaliatory animus by refusing to consider Nashid Akil for promotion due to Nashid Akil engaging in protected activity.

187.     The City denied Nashid Akil's right to receive promotions as the City disqualified Nashid Akil for consideration due to retaliation and discrimination.

188.    December 2021: there was an instruction to expedite the investigation, which was stagnate at that time, and Nashid Akil was under the impression that the investigation would be expedited and closed so that Nashid Akil could finally receive the long overdue promotion to Inspector.

189.    That did not happen.

190.    December 2021, plus 6 months and it was now the middle of 2022:  Nashid Akil is a Captain of the 22nd Police District and working diligently toward a long held objective of being promoted to Inspector.

191.    Nashid Akil was passed over for the promotion that Nashid Akil had worked toward for the past twenty-three (23) years.

192.    About six (6) months later there was an encounter between Nashid Akil and Commissioner, Defendant, Outlaw at a police training facility located in Northeast Philadelphia.

193.    Nashid Akil and Defendant, Outlaw spoke and Nashid Akil asked Outlaw about the investigation and the expedited status.

194.    Outlaw knew exactly what Nashid Akil referred to and stated that she did in fact instruct the investigation to be expedited and that she would look into it.

195.    Nashid Akil was then subjected to retaliatory discipline.

196.    Nashid Akil received a 7518 which is the document-name for a disciplinary writeup within the PPD.

197.    Nashid Akil received a 7518 subject to the investigation into the Tucker situation.

198.    June 13, 2022:  Nashid Akil was subjected to five (5) intentionally false allegations given to Nashid Akil as part of a strategy of retaliatory intent.

199.    Nashid Akil signed not guilty and received a sham hearing on September 19, 2022.

200.    The hearing recommendation was not for dismissal.

201.    Outlaw received the recommendation from the hearing and went against the recommendation of the hearing in order to terminate Nashid Akil's employment.

202.    Defendants terminated Nashid Akil as part of a strategy of retaliation to which Nashid Akil was subjected by the Philadelphia Police Commissioner Outlaw and by Deputy Commissioner Wimberly.

203.    Nashid Akil was subjected to intentionally false discipline in 2022 as part of Defendants' campaign of retaliation.

204.    All of the false discipline to which Nashid Akil was subjected was presented as part of the strategy of retaliation.

205.    Defendants, and the individual Defendants and IA acted inappropriately and illegally by subjecting Nahid Akil to false discipline for offenses that are so transparently retaliation that no other person in Captain Akil's position would have every received discipline for the same or substantially similar offenses.

206.    Captain Nashid Akil received disciplinary writeup for "failure to supervise" for an incident that no other similarly situated police Captain would have ever been disciplined for.

207.    Defendants acted with willful disregard for the law such that Defendants and the individual Defendants should be held liable for punitive damages.

208.    The Defendants and the individual Defendants willfully and intentionally violated Captain Nashid Akil's rights by making an example out of Captain Nashid Akil due to Defendants' discriminatory and retaliatory animus.

209.    Nashid Akil was targeted for a false investigation and subjected to multiple incidents of false disciplinary writeups as part of Defendants, and the individual Defendants' strategy of discrimination and retaliation.

210.    Plaintiff was denied due process under color of state law as Plaintiff was never afforded the opportunity to demonstrate through a due process hearing that Defendants were subjecting Plaintiff to discrimination and retaliation.

211.    Defendants refused to consider Plaintiff's due process rights by targeting and terminating Plaintiff's employment.

212.    Defendants targeted Plaintiff due to Plaintiff's reports of fraud, abuse, and waste in order to deny Plaintiff the ability to be promoted and then in order to end Plaintiff's nearly twenty-five (25) year career with the Philadelphia Police Department.

213.    Defendants illegal conduct has caused Plaintiff to suffer significant injury including loss of income, loss of pension benefits, loss of enjoyment of life, loss of reputation, and other losses more fully described herein.

214.    Plaintiff should have had the opportunity to work at least another twenty (20) years as a PPD Police Inspector which would have significantly increased Plaintiff's pension benefits.

215.    As a result of Defendants' conduct Plaintiff has been extremely humiliated, degraded, victimized, embarrassed, and emotionally distressed.

216.    As a result of Defendants' conduct Plaintiff was subjected to discriminatory treatment and retaliation, and continues to suffer severe emotional distress and physical ailments.

217.    As a result of Defendants' conduct Plaintiff has been subjected to discriminatory and retaliatory conduct and suffers from regular panic attacks.  Plaintiff has difficulty sleeping and eating.

218.    Defendants conduct has been malicious, willful, outrageous, and conducted with full knowledge of the law, and Plaintiff demands Punitive Damages against all Defendants jointly and severally.

219.    Defendants have established a pattern and practice of discrimination, retaliation, and harassment through their actions and Plaintiff is just another employee in a long ling of Philadelphia Police Officers who are targeted for discrimination and retaliation after engaging in protected activity.

220.    Defendants have a pattern and practice of subjecting employees to discrimination and retaliation and Plaintiff intends to present several examples that clearly demonstrate Defendants' policy to disregard anti retaliation laws.

221.    The discrimination and retaliation and its effects will continue beyond the date of this complaint, and as such, Plaintiff makes a claim for all damages including future damages.

222.    The above are just some of the examples of unlawful discrimination and retaliation to which Plaintiff was subjected.

223.    As a result of Defendants' conduct, Plaintiff was caused to sustain serious and permanent personal injuries, and including permanent psychological injuries.

224.    As a result of Defendants' conduct, Plaintiff has been humiliated, degraded, victimized, embarrassed and emotionally distressed.

225.    As a result of the acts and conduct complained of herein, Plaintiff has suffered and will continue to suffer a loss of income, a loss of salary, bonuses, benefits and other compensation, which such employment entails.

226.    Plaintiff has also suffered future pecuniary losses, emotional pain, humiliation, suffering, inconvenience, loss of enjoyment of life, and other non-pecuniary losses.

227.    Plaintiff has further experienced severe emotional and physical distress.

228.    Plaintiff claims a continuous practice of discrimination and claims a continuing violation and makes all claims herein under the continuing violations doctrine.

229.    The Defendants have exhibited a pattern and practice of not only discrimination but also retaliation.

230.    Plaintiff claims that Defendants discriminated against Plaintiff because of Plaintiff's sex and gender and because Plaintiff complained and opposed the unlawful conduct of Defendants related to Plaintiff's protected class.

231.    Plaintiff further claims aggravation, activation, and exacerbation of any pre-existing condition.

232.    Plaintiff claims unlawful constructive discharge and/or unlawful actual discharge and also seeks reinstatement.

## COUNT I
### 42 U.S.C. §1983
### VIOLATIONS OF EQUAL PROTECTION CLAUSE, FIRST
### AMENDMENT RIGHT TO DUE PROCESS AND SUBSTANTIVE DUE PROCESS
(against all named Defendants)

233.    Plaintiff hereby incorporates all allegations contained in the foregoing paragraphs as fully as if they were set forth at length.

234.    42 U.S.C. Section 1983 stated:

"Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable. For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia."

177.    Defendants and their employees and agents violated Plaintiffs' First, Fifth, Fourth and Fourteenth Amendment rights, including the right to equal protection under the laws.

178.    Defendants acted under color of state law to violate the plaintiff's rights to equal protection and due process of law.

179.    Defendants' unlawful actions were done with the specific intent to deprive Plaintiff of her constitutional right to be free from unreasonable seizer and to enjoy equal protection under the laws.

180.     Defendants also violated Plaintiff's rights under Title VII of the Civil Rights Act of 1964 through discrimination and retaliation for reporting said discrimination.

181.     All individual Defendants acted under color of state law at all times relevant to this civil action.

182.     The City of Philadelphia is liable under Section 1983 under Monell.

**WHEREFORE**, Plaintiffs seek the damages set forth in the Prayer for Relief clause of this Complaint, infra.

**COUNT II**
**42 Pa.C.S. § 1421, et seq.**
**<u>PENNSYLVANIA WHISTLEBLOWER LAW</u>**

183.     Plaintiffs incorporate the preceding paragraphs of this Complaint, as if the same were set forth herein at length.

184.     The Pennsylvania Whistleblower Law, 42 Pa.C.S. § 1421, et seq. prevents covered employers from disciplining or firing an employee who makes a good faith report or is about to report, verbally or in writing, to the employer or appropriate authority, an instance of wrongdoing or waste.

185.     Defendant is a "covered employer" under the statute in that Defendant operates and at all times relevant operated pursuant to a grant by the Pennsylvania Department of Human Services, which is a political subdivision of the Commonwealth of Pennsylvania.

186.     Defendant either received funding from the Commonwealth of Pennsylvania and/or a political subdivision of the Commonwealth of Pennsylvania or contracted with same during the relevant time period.

187.     This funding was received by Defendant to perform work or provide services relative to the performance of work for or the provision of services to a public body.

188.    Plaintiffs reported to Defendants various health and safety related issues that Plaintiffs reasonably believed were instances of wrongdoing and/or waste.

189.    Plaintiffs reported that wrongdoing and waste in order to protect the health of the citizens of the Commonwealth of Pennsylvania.

190.    Thereafter, Defendant took adverse employment actions against Plaintiff, including, but not limited to, subjecting them to false discipline and terminating Plaintiff's employment.

191.    There exists a causal connection between Plaintiffs' health and safety complaints and the adverse employment actions.

**WHEREFORE**, Plaintiffs seek the damages set forth in the Prayer for Relief clause of this Complaint, infra.

## COUNT III
## WRONGDUL DISCHARGE
## <u>PUBLIC POLICY</u>

192.    Plaintiffs incorporate by reference each allegation contained in the preceding paragraphs as if the same were set forth more fully at length herein.

193.    Throughout their employment, all Plaintiffs refused to violate statutory and/or professional duties relating to issues involving health and safety and COVID-19 prevention.

194.    Specifically, Plaintiffs refused to adhere to Director's illegal directive to ignore COVID-19 cleanliness standards imposed via various statutes.

195.    Further, Plaintiffs objected to Director's attempts to deny patients needed emergent care.

196.    Plaintiffs were terminated as a result.

197.    Plaintiffs were terminated in violation of a clear mandate of public policy of the Commonwealth of Pennsylvania.

**WHEREFORE**, Plaintiffs seek the damages set forth in the Prayer for Relief clause of this Complaint, infra.


## <u>PRAYER FOR RELIEF WHEREFORE</u>

Plaintiffs, Nashid Akil request that the Court grant the following relief against Defendants:

a)   Damages for past and future monetary losses as a result of Defendant's unlawful discrimination;

b)   Compensatory damages;

c)   Punitive damages;

d)   Liquidated damages;

e)   Emotional pain and suffering;

f)   Reasonable attorneys' fees;

g)   Recoverable costs;

h)   Pre and post judgment interest;

i)   An allowance to compensate for negative tax consequences;

j)   A permanent injunction enjoining Defendant, its directors, officers, employees, agents, successors, heirs and assigns, and all persons in active concert or participation with them, from engaging in, ratifying, or refusing to correct, employment practices which discriminate in violation of TITLE VII, the PHRA, the PFPO, Section 1981 and the common law of the Commonwealth of Pennsylvania.

k)  Order Defendant to remove and expunge, or to cause to be removed and expunged, all negative, discriminatory, and/or defamatory memoranda and documentation from Plaintiffs' record of employment, including, but not limited, the pre-textual reasons cited for their adverse actions, disciplines, and termination; and,

l)  Awarding extraordinary, equitable and/or injunctive relief as permitted by law, equity and the federal statutory provisions sued hereunder, pursuant to Rules 64 and 65 of the Federal Rules of Civil Procedure.

**WHEREFORE**, Plaintiff demands judgment against Defendants, jointly and severally, in an amount to be determined at the time of trial plus interest, punitive damages, liquidated damages, statutory damages, attorneys' fees, costs, and disbursements of action; and for such other relief as the Court deems just and proper.

## <u>JURY DEMAND</u>

Plaintiff requests a jury trial on all issues to be tried.

**DEREK SMITH LAW GROUP,  PLLC**

By:   ____/s/ Seth D. Carson_____
       Seth D. Carson, Esquire
       1835 Market Street
       Suite 2950
       Philadelphia, Pennsylvania 19103
       Phone: 215.391.4790
       Email: seth@dereksmithlaw.com

DATED: July 11, 2023