**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **NASHID AKIL** : | |
| : | **CIVIL ACTION** |
| v. : | **No. 23-2654** |
| : | |
| **CITY OF PHILADELPHIA, et al.** : | |

**McHUGH, J.**                                                                                                            **December 11, 2023**

**MEMORANDUM**

    This is an action brought by former Philadelphia Police Captain Nashid Akil against the City of Philadelphia and a host of Philadelphia Police Department officials. Plaintiff's Amended Complaint takes a "firehose" approach, presenting twenty-seven pages of wide-ranging factual allegations, and claiming violations of 42 U.S.C. §§ 1981 and 1983, the Pennsylvania Whistleblower Act, and public policy. Because the Amended Complaint fails to plead facts that could establish any of Plaintiff's claims, I will grant the Defendants' motion to dismiss.

**I.      Relevant Background**

    The Amended Complaint delivers a blitz of allegations, the plausibility of which are undermined by grammatical mistakes and swaths of text copied from other cases, as evidenced by differing fonts and references to unrelated facts and plaintiffs. *See, e.g.*, Am. Compl. ¶¶ 352, 367 (ECF 16). Amidst this confusion, the essential details of the Amended Complaint appear to be as follows.

    Plaintiff Nashid Akil served in the Philadelphia Police Department (PPD) from April, 2000 until his resignation in February, 2023. Am. Compl. ¶¶ 60, 62. During the events at issue, Plaintiff was the Captain of Philadelphia's 22nd Police District. *Id.* ¶ 173. In the early days of the 2020 pandemic, Plaintiff's subordinate, Sergeant James Tucker, took a leave of absence for a COVID-

19 diagnosis.  *Id.* ¶¶ 176-80.  City policy at that time guaranteed fourteen days off for COVID-positive employees to quarantine, including police officers.  *Id.* ¶¶ 181-82.  According to Plaintiff, City employees could invoke this policy without submitting any evidence of a diagnosis, and Plaintiff began to investigate whether Tucker was falsely claiming illness to receive paid time off.  *Id.* ¶¶ 183-98, 202-03.

As Tucker's fourteen-day quarantine period was ending in late April, 2020, he allegedly "reported that he was not returning to active duty."  *Id.* ¶ 201.  Plaintiff took no apparent steps to terminate or suspend Tucker.  Rather, Plaintiff alleges that he "continued his investigation while Sergeant Tucker continued [to] game the system."  *Id.* ¶ 203.  Confusingly, despite Tucker's indication that he would not be returning to work, Plaintiff also claims that Tucker "was scheduled to return to active duty" twenty-nine days after his initial leave began.[1]  *Id.* ¶¶ 204-10.  And although Tucker did not return to work as scheduled, he allegedly "continued to receive full pay."  *Id.* ¶ 204.  Plaintiff also alleges that during Tucker's absence, he happened to see Tucker at a car wash appearing healthy and not wearing a mask.  *Id.* ¶¶ 216-17.  Plaintiff took this as confirmation that Tucker was indeed abusing the City's COVID-19 leave policy.  *Id.* ¶ 218.

Sometime around May 18, 2020, Plaintiff claims that he finally reported Tucker's unapproved absences to the PPD's legal adviser, Defendant Francis Healy.  *Id.* ¶¶ 223-25, 233.  Plaintiff says that he "followed well-established policies and procedures" in making this report.  *Id.* ¶ 223.

---

[1] The Amended Complaint at times appears to make contradictory assertions or lacks essential clarifying information.  For example, paragraph 208 says that "Tucker remained out of work for twenty-nine (29) days," paragraph 210 says that "Tucker did not return to work for approximately forty (40) days," and paragraph 194 says that Tucker "continu[ed] his sick leave for over a year."

2

Without further detail, Plaintiff then makes the rather startling accusation that "Tucker remained out of work under [the pretense of illness] for more than one (1) year" with pay. *Id.* ¶ 229. According to Plaintiff, "[m]onth after month passed and Tucker just remained out of work while he was visibly healthy, obviously asymptomatic, and clearly not contagious." *Id.* ¶ 239. The Amended Complaint does not reconcile this assertion with the prior claim that Tucker's leave was extended to only forty days. Nor does it indicate what steps Plaintiff took as Tucker's supervisor to address such an extended absence, other than his report to Healy in May, 2020. The Amended Complaint even notes that it became "clear [to Plaintiff] through his investigation that Tucker was not sick and that Tucker was submitted (sic) fraudulent information to the City in order to siphon money from the City's CODID (sic) relief fund." *Id.* ¶ 232. Plaintiff insinuates that he could not monitor Tucker's whereabouts through most of 2020 because of mass demonstrations taking place in Philadelphia, which consumed Plaintiff's time. *Id.* ¶¶ 240-44. Plaintiff also claims that it was ultimately Tucker's responsibility as "an adult male who held a supervisor position within the PPD" to "contact his district and provide notification of [his] intentions regarding a return to work." *Id.* ¶¶ 236-37.

By February, 2021, Plaintiff alleges that he was finally directed by PPD officials to notify Tucker that he was terminated from the PPD.[2] *Id.* ¶¶ 248-250. Around this time, Plaintiff also allegedly made a second report about Tucker's abuse of the City's COVID-19 policy to Defendant Yvonne Banks and other PPD supervisors. *Id.* ¶¶ 256-257. Plaintiff does not indicate why he felt compelled to make this second report, since PPD officials were apparently aware of Tucker's absence by then and acting to terminate him.

---

[2] Although the Amended Complaint alleges that Tucker remained out of the office for more than a year, the dates alleged would indicate that Tucker remained out of work for about nine months.

3

Soon after making this second report, Plaintiff claims that PPD leaders launched an investigation into *him*, on the ground that Tucker's prolonged absence occurred under Plaintiff's watch. *Id.* ¶¶ 264-266. Plaintiff alleges, however, that this entirely plausible basis for investigating him – that he abdicated his responsibility as a supervisor – masked the "real" motive, to retaliate against Plaintiff for "whistleblowing" about Tucker's behavior.[3]  *Id.* ¶¶ 267-269.

Plaintiff claims that he learned of the investigation into him in June, 2021, and that he subsequently sent a memo to PPD officials complaining of his mistreatment.[4]  *Id.* ¶¶ 274-76. Sometime after sending this memorandum, Plaintiff was also denied promotion and allegedly told by Defendant Wimberly that he could not be promoted because of the "open investigation" into him.[5]  *Id.* ¶¶ 284-302.

Plaintiff eventually received a formal disciplinary action for "failure to supervise" related to "five (5) intentionally false allegations," which the Amended Complaint does not recount. *Id.* ¶¶ 321, 313. He contested the disciplinary action, allegedly received a "sham hearing,"[6] and was

---

[3] Plaintiff alleges that the Police Commissioner, Defendant Daniel Outlaw, instructed a Deputy Commissioner, Defendant Robin Wimberly, to launch the investigation. *Id.* ¶ 265. The investigation was allegedly conducted by Defendant Richard Stein of the PPD Internal Affairs Bureau. *Id.* ¶ 264.

[4] Without any further description, the Amended Complaint also adds that "[t]he written [memo] includes reports of (1) disparate treatment, (2) hostile work environment, (3) prejudice, and (4) violation of the City's EEO policy." *Id.* ¶ 276. Plaintiff also intimates that Defendant Joel Dales, as Deputy Commissioner, received an email about this memo in July, 2021. *Id.* ¶ 279. The Amended Complaint makes no other specific allegations regarding Dales, except that Dales "had the authority to force Plaintiff out of work and to force Plaintiff to end his career with the City." *Id.* ¶ 21.

[5] The Amended Complaint notes that PPD's Chief Inspector was Defendant Michael Cochrane at the time of his promotion denial. *Id.* ¶ 291. The Amended Complaint initially claims that "Michael Cochrane used his supervisory authority to violate Plaintiff's rights" and "was in a position to . . . alter[] the terms and conditions of Plaintiff's employment" but does not make any specific allegations about Cochrane beyond this. *Id.* ¶¶ 24, 25.

[6] Plaintiff offers no specific details about this hearing but alleges elsewhere in the Amended Complaint that Defendants "subjected Plaintiff to false discipline and refused to permit Plaintiff to face his accuser, or present evidence that contradicted the false narrative Defendants relied upon." *Id.* ¶ 149.

subsequently recommended for termination by Police Commissioner Daniel Outlaw.[7] *Id.* ¶¶ 314-16. Plaintiff avers that a union representative called him on February 6, 2023 and informed him that he was "scheduled to be terminated" two days later. *Id.* ¶ 147. Plaintiff then resigned from the Police Department before he could be terminated, allegedly to preserve his pension. *Id.* ¶ 64.

Plaintiff broadly alleges that the investigation into him, the denial of his promotion, the "sham hearing," and the decision to terminate him were all part of campaign of retaliation by the Defendants because he reported fraud, waste, and abuse of government resources in the form of Tucker's extended absence. *See id.* ¶ 102. In addition, Plaintiff claims that each of the Defendants discriminated against him because he is African American, and that, had he been white, he would not have been investigated, denied promotion, or constructively terminated. *Id.* ¶¶ 383-93. Finally, he alleges that the City of Philadelphia's policies and practices allowed the retaliation and discrimination against him to occur. *Id.* ¶¶ 71, 73, 75, 84-87.

## II. Legal Standard

Motions to dismiss under Federal Rule of Civil Procedure 12(b)(6) are governed by the well-established standard set forth in *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009).

## III. Discussion

The Amended Complaint alleges four counts: violation of 42 U.S.C. § 1983 (against all Defendants), violation of the Pennsylvania Whistleblower Law (against the City of Philadelphia),[8]

---

[7] Plaintiff also alleges that Defendant John Stanford, as Inspector of Internal Affairs, "subjected Plaintiff to violations of Plaintiff's rights" and "used his authority as human resources executive to subject Plaintiff to adverse employment actions." *Id.* ¶¶ 28-30. The Amended Complaint alleges nothing else about Stanford.

[8] The Amended Complaint does not specify against whom this Count is alleged but the language of the Amended Complaint, describing "Defendant" as a "covered employer" who receives funding from the Commonwealth of Pennsylvania, indicates that this Count is alleged only against the City of Philadelphia. Am. Compl. ¶¶ 357-58.

wrongful discharge (public policy),[9] and violation of 42 U.S.C. § 1981 (against all Defendants). As explained below, each of these counts will be dismissed.

### A. Plaintiff fails to state a constitutional claim under § 1983 because he does not sufficiently allege any underlying deprivation of his rights.

To establish a claim under 42 U.S.C. § 1983, Plaintiff must plead with sufficient detail that each Defendant violated the Constitution or federal law in a matter that deprived Plaintiff of his rights, privileges, or immunities. To pursue a § 1983 claim against the City of Philadelphia, he must also sufficiently plead "that the deprivation of those rights was caused by an official government policy or custom." *Galarza v. Szalczyk*, 745 F.3d 634, 639 (3d Cir. 2014). Plaintiff alleges that all Defendants violated his rights under the First, Fourth, Fifth, and Fourteenth Amendments, as well as his rights under Title VII of the Civil Rights Act, but his pleading is defective as to all the claims asserted. I conclude that Plaintiff has not sufficiently pled a violation of any of these rights to sustain a § 1983 action.

    i. First Amendment

"[A] State may not discharge an employee on a basis that infringes that employee's constitutionally protected interest in freedom of speech." *Rankin v. McPherson*, 483 U.S. 378, 383 (1987). To that end, "public employees do not surrender all their First Amendment rights by reason of their employment. Rather, the First Amendment protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern." *Garcetti v. Ceballos*, 547 US 410, 417 (2006). Thus, for a public employee's speech to receive constitutional protection, they must speak: (1) on a matter of public concern; and (2) as a private citizen rather than in their official capacity. *Borough of Duryea v. Guarnieri*, 564 U.S. 379, 386 (2011);

---

[9] The Amended Complaint also does not specify against which Defendants this claim is made. That may be, as explained below, because this Count appears to be recopied in error from another document.

6

*Amalgamated Transit Union Loc. 85 v. Port Auth. of Allegheny Cnty.*, 39 F.4th 95, 103-04 (3d Cir. 2022).

Plaintiff claims that all Defendants violated his First Amendment rights by constructively terminating him after he spoke out in two instances: First, "about how the police was treating the community and specifically vulnerable members of the community;" and second, "about fraud and waste within the City of Philadelphia." Am. Compl. ¶¶ 155, 159.

The Amended Complaint offers no further details about Plaintiff's speech concerning how police treat the community. It is unclear what that speech consisted of, to whom any statement was made, or when it occurred. Plaintiff makes no allegation that any Defendant heard or knew of such speech, or that the Defendants took any actions toward Plaintiff related to this speech. Consequently, there are no facts that plausibly raise a First Amendment claim as to this speech.

Plaintiff offers more details about his speech on fraud and waste of government resources (*i.e.*, Sergeant Tucker's alleged abuse of the Philadelphia Police Department's COVID-19 leave policy). Plaintiff alleges that he reported this "fraud, abuse and waste to management," including to "the City's legal advisor, Defendant, Francis Healey." Am. Compl. ¶¶ 187, 225. Later, he "contacted Defendant, Yvonne Banks to notify Banks of Tucker's expiration of sick time and refusal to return to work." *Id.* ¶ 256. "Banks [subsequently] instructed [Plaintiff] to send [a] memorandum . . . informing the chain of command that Tucker had used all his sick time . . . and still was not returning to active duty." *Id.* ¶ 257. These reports to Healey and Banks, as well as the subsequent memorandum to the PPD "chain of command," purportedly sparked the retaliation. Compl. ¶¶ 258, 265-69, 321, 327.

But the facts as pled reveal Plaintiff's reports were made in his official capacity as a Philadelphia Police Captain, not as a citizen addressing a matter of public concern. "Speech

7

involves matters of public concern 'when it can be fairly considered as relating to any matter of political, social, or other concern to the community,' or when it 'is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public.'" *Lane v. Franks*, 573 U.S. 228, 241 (2014) (quoting *Snyder v. Phelps*, 562 U.S. 443, 453 (2011)).

Plaintiff does not allege that his reports addressed or even intended to address a matter of broad public concern, such as some widespread abuse of the City's COVID-leave procedures. Rather, he reported specific details about one individual, sent internally to PPD officials for the purpose of dealing with that individual. Likewise, although Plaintiff claims his reports addressed fraud, waste, and abuse of city resources, it is also an obvious duty of a police supervisor to notify leaders about a sergeant's prolonged, unauthorized absence. The Amended Complaint even acknowledges that Plaintiff's first report about Tucker "followed well-established policies and procedures." Am. Compl. ¶ 223.[10] Communications made in discharge of one's duty as a public employee do not constitute statements of general public concern. *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006). Consequently, even if these reports led to adverse employment actions against Plaintiff, they were not protected speech under the First Amendment.

    ii.    *Fourth Amendment*

Plaintiff next alleges that "Defendants' unlawful actions were done with the specific intent to deprive Plaintiff of her (sic) constitutional right to be free from unreasonable seizer (sic)" under the Fourth Amendment. Am. Compl. ¶ 352. A "seizure of property occurs when there is some

---

[10] The Amended Complaint mentions an additional report that Plaintiff allegedly made about Richard Stein, of the PPD Internal Affairs Bureau, and sent to Captain Pasquale Agozzino. Am. Compl. ¶¶ 275-77. But unlike the other reports, the Amended Complaint does not allege that this report constituted protected speech under the First Amendment for which Plaintiff was later retaliated against. In any event, this memorandum was also made in Plaintiff's capacity as a police officer and was related to his personal treatment, not a matter of public concern.

meaningful interference with an individual's possessory interests in [their] property" through governmental action. *United States v. Jacobsen*, 466 U.S. 109, 114 (1984). But the Amended Complaint does not describe the seizure of any property belonging to Plaintiff that would plausibly violate Plaintiff's Fourth Amendment rights. There is no apparent basis for any Fourth Amendment claim.

### iii. Fifth Amendment

Plaintiff also fails to allege a Fifth Amendment violation by any Defendant because the Due Process Clause of the Fifth Amendment only restricts actions by federal actors. *See Nguyen v. U.S. Cath. Conf.*, 719 F.2d 52, 54 (3d Cir. 1983). All Defendants in this case, as employees of the City of Philadelphia or the city itself, are state-level actors, not federal. *See Hubbard v. Taylor*, 399 F.3d 150, 158 n.13 (3d Cir. 2005).[11]

### iv. Fourteenth Amendment

#### a. Equal Protection

Plaintiff further claims that all Defendants violated his Constitutional right to equal protection under the law. The Fourteenth Amendment's Equal Protection Clause states that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. "To establish an equal-protection claim, a plaintiff must show that the Government has treated it differently from a similarly situated party and that the Government's explanation for the differing treatment does not satisfy the relevant level of scrutiny." *Stradford v. Sec'y Pa. Dep't of Corrs.*, 53 F.4th 67, 73-74 (3d Cir. 2022) (citations omitted). "[F]ailure to

---

[11] Fifth Amendment due process claims invoke "identical provisions of the Fourteenth amendment," which does apply to the states, so this claim is properly addressed under the Fourteenth Amendment's Due Process Clause. *McSpadden v. Wolfe*, No. 7-1263, 2008 WL 910010, at *11 (E.D. Pa. Apr. 2, 2008) (DuBois, J.) (citations omitted).

identify similarly situated persons dooms an equal-protection claim." *Id.* (citing *Hill v. Borough of Kutztown*, 455 F.3d 225, 239 (3d Cir. 2006)).

Here, Plaintiff alleges that "White PPD Police Captains were treated in a manner that was completely different" from Plaintiff, who is African American, and that "no other similarly situated police Captain would have ever been disciplined" as he was. Am. Compl. ¶¶ 157, 321. But Plaintiff does not identify any similarly situated individuals who were, in fact, treated differently by any Defendant, let alone by *all* Defendants. Without identifying any comparators, Plaintiff's conclusory allegations cannot sustain his claim that he received different treatment because he is African American. *See Rollins v. Kerestes*, No. 13-7473, 2015 WL 418154, at *2 (E.D. Pa. Jan. 30, 2015) (Restrepo, J.). And regarding his claim that *no* other police captain would be disciplined as he was, the Supreme Court has squarely rejected this kind of "class-of-one" equal protection theory for public employees. *Engquist v. Or. Dep't of Agric.*, 553 U.S. 591, 594 (2008). Accordingly, Plaintiff does not sufficiently allege an equal protection violation.

b. <u>Procedural Due Process</u>

Plaintiff next alleges that all Defendants violated his right to procedural due process under the Fourteenth Amendment.[12] States may not deprive a person of their property "without due process of law." U.S. Const. amend. XIV, § 1. To plead a procedural due process violation, Plaintiff "must allege that [he] was deprived of an individual interest that is encompassed within the Fourteenth Amendment's protection of life, liberty, or property and that the available procedures did not provide due process of law." *Thompson v. State of Del. Dep't of Servs. for Child., Youth & Fams.*, 44 F.4th 188, 194 (3d Cir. 2022) (citations omitted).

---

[12] Plaintiff does not explicitly invoke the phrase "procedural due process," but he claims that Defendants (without specifying which Defendants) refused to permit him to "face his accuser" or present certain evidence, and that he "was never afforded the opportunity to demonstrate through a due process hearing that Defendants were subjecting Plaintiff to discrimination and retaliation." Am. Compl. ¶¶ 149, 325.

"For a discharged government employee to succeed on a violation of procedural due process claim, the employee must first prove that [he] possessed a constitutionally protected property right in [his] continued employment." *Mancini v. Northampton Cnty.*, 836 F.3d 308, 315 (3d Cir. 2016). "Whether a person has a legitimate entitlement to – and hence a property interest in – his government job is a question answered by state law." *Hill v. Borough of Kutztown*, 455 F.3d 225, 234 (3d Cir. 2006). "In the governmental context, while at-will employment is not generally considered a property interest, employment contracts that contain a 'just cause' provision create a property interest in continued employment." *Wilson v. MVM, Inc.*, 475 F.3d 166, 177 (3d Cir. 2007) (citing *Thomas v. Hammonton*, 351 F.3d 108, 113 (3d Cir. 2003) and *Kelly v. Sayreville*, 107 F.3d 1073, 1077 (3d Cir. 1997)).

The Amended Complaint does not address whether Plaintiff's employment was at-will or if his employment contract contained a "just cause" provision to create a constitutionally protected property interest. Pennsylvania law does grant a property interest to police officers of *boroughs*. *See* 8 Pa. Stat. and Cons. Stat. Ann. § 1190 ("No person employed in any police or fire force of any borough may be suspended without pay, removed or reduced in rank except for the following reasons . . . ."); *accord Dee v. Borough of Dunmore*, 549 F.3d 225, 229-30 (3d Cir. 2008). But Philadelphia is a city, not a borough,[13] so this statute does not apply here.

Plaintiff points to no facts or law to establish that he had a constitutionally protected property interest in his continued employment. His procedural due process claim will therefore be dismissed, albeit without prejudice.

c.  Substantive Due Process

---

[13]  *See PA Municipalities List*, PA.gov, https://dced.pa.gov/local-government/municipal-statistics/municipalities/ [https://perma.cc/57C2-7VYA].

Plaintiff claims that the Defendants violated his substantive due process rights under the Fourteenth Amendment as well.  The Due Process Clause encompasses a substantive component which "protects individual liberty against certain government actions regardless of the fairness of the procedures used to implement them."  *Nekrilov v. Jersey City*, 45 F.4th 662, 680 (3d Cir. 2022) (quoting *Collins v. City of Harker Heights*, 503 U.S. 115, 125 (1992)).  "To sustain a substantive due process claim, a plaintiff must show that the particular interest in question is protected by the Fourteenth Amendment and that the government's deprivation of that interest 'shocks the conscience.'  The shocks-the-conscience test applies regardless of the theory upon which the substantive due process claim is premised."  *Vargas v. City of Phila.*, 783 F.3d 962, 973 (3d Cir. 2015) (citations omitted).

The Amended Complaint alleges in one line that "Plaintiff was subjected to equal protection violations and violations of his substantive rights under the First and Fourteenth Amendments by each and every Defendants (sic) named above."  No explanation is given for how Plaintiff's substantive due process rights were violated.  To the extent that Plaintiff is claiming his constructive termination violated substantive due process, his claim cannot survive.  "[F]or a property interest to be protected for purposes of substantive due process, it must be 'fundamental' under the United States Constitution.  But public employment is not a fundamental right."  *Dondero v. Lower Milford Twp.*, 5 F.4th 355, 362 n.1 (3d Cir. 2021) (citing *Hill*, 455 F.3d at 234 n.12 and *Nicholas v. Pa. State Univ.*, 227 F.3d 133, 142-43 (3d Cir. 2000)).

No other alleged facts come close to meeting the high bar to establish a substantive due process violation.  According to the Amended Complaint, PPD sought to terminate Plaintiff for failing to supervise his direct subordinate, who, by Plaintiff's own admission, received months of pay despite a prolonged, unauthorized absence.  Although "[t]he exact degree of wrongfulness

necessary to reach the 'conscience-shocking' level depends upon the circumstances of a particular case," no individual Defendants are alleged to have taken any specific actions against Plaintiff that could plausibly meet this standard. *Vargas*, 783 F.3d at 973 (citation omitted).

        *v.*    Title VII

Lastly, in support of his § 1983 claim, Plaintiff claims that the Defendants "violated Plaintiff's rights under Title VII of the Civil Rights Act of 1964 through discrimination and retaliation for reporting said discrimination." Am. Compl. ¶¶ 81, 353.

The Third Circuit has held that "Title VII . . . statutory rights cannot be vindicated through § 1983." *Williams v. Pa. Hum. Rels. Comm'n*, 870 F.3d 294, 299-300 (3d Cir. 2017). This is because "[a]llowing pure Title VII . . . claims under § 1983 would thwart Congress's carefully crafted administrative scheme by throwing open a back door to the federal courthouse." *Id.* This claim will therefore be dismissed.

**B. Plaintiff fails to state a claim under the Pennsylvania Whistleblower Law because he has not pled facts to plausibly establish retaliation for whistleblowing activities.**

"To state a claim for a violation of the Pennsylvania Whistleblower Law, a plaintiff must allege both that [he] 'reported or was about to report in good faith, verbally or in writing, an instance of wrongdoing or waste to the employer or an appropriate authority' and that there is a causal connection between [his] report and termination or other 'alleged retaliatory acts.'" *Lomaskin v. Siemens Med. Sols. USA, Inc.*, No. 18-4257, 2019 WL 13426203, at *1 n.1 (E.D. Pa. Aug. 14, 2019), *aff'd*, 820 F. App'x 138 (3d Cir. 2020) (citing 43 Pa. Stat. Ann. § 1424(b) and *O'Rourke v. Commonwealth*, 778 A.2d 1194, 1200 (Pa. 2001)).

The Amended Complaint describes three reports of potential wrongdoing or waste by Plaintiff to an appropriate authority within the PPD: two reports (and a follow-up memorandum) by Plaintiff regarding "fraud, waste, and abuse" allegedly committed by one individual, Sergeant

Tucker, as well as a separate memorandum detailing Plaintiff's own mistreatment by PPD officials.[14]

As a matter of common sense, a whistleblower is someone who lacks the authority to stop an instance of fraud or wrongdoing and therefore reports it to those with the power to act. The Court cannot comprehend how Plaintiff, as a police captain, could possibly "blow the whistle" to authorities about the unauthorized absences of a sergeant under Plaintiff's *own* command. Even if Plaintiff needed concurrence from PPD's legal advisor that Tucker's absence was unacceptable, he claims he received it. Am. Compl. ¶¶ 234-35. His initial report about Tucker was therefore not ignored. And given that, there is no logical explanation why Plaintiff would need to submit a second report about Tucker's absences, having already "received written instructions to notify Tucker that he did not qualify for active duty." *Id.* ¶ 248. There is simply no basis on which to infer that Plaintiff was terminated for having delivered unwelcome news about a waste of government resources.

Additionally, Plaintiff's allegation that he "drafted" a report on "(1) disparate treatment, (2) hostile work environment, (3) prejudice, and (4) violation of the City's EEO policy," is too vague to state a claim. Plaintiff does not allege who received this report if anyone, what underlying allegations it contained, or when it was allegedly drafted in relation to his resignation. And to the extent that his report was one complaining of the treatment of Plaintiff himself, I do not construe that as giving rise to a claim under the Whistleblower Law.

On these facts, Plaintiff does not plausibly allege that he was discharged or retaliated against for reporting "an instance of wrongdoing or waste." 43 Pa. Stat. Ann. § 1423.

---

[14] The Amended Complaint also vaguely alleges that Plaintiff reported "various health and safety related issues" that he "reasonably believed were instances of wrongdoing and/or waste." Am. Compl. ¶ 361. This assertion is likely copied in error from another source, as are other parts of the Amended Complaint, since this appears to be the only mention of any "health and safety related" issues or reports.

### C. Plaintiff fails to state a claim for wrongful discharge in violation of public policy.

Plaintiff's "Wrongdul Discharge" (sic) claim will also be dismissed. Pennsylvania law recognizes "a cause of action for wrongful discharge when dismissal of an at-will employee violates a clear mandate of public policy." *Borse v. Piece Goods Shop, Inc.*, 963 F.2d 611, 617 (3d Cir. 1992), *as amended* (May 29, 1992). "To maintain a claim for wrongful discharge in violation of public policy, a plaintiff in some way must allege that some public policy of [Pennsylvania] is implicated, undermined, or violated because of the employer's termination of the employee. Consequently, a plaintiff may only point to violations of federal law to the extent that they embody public policy of Pennsylvania." *Spyridakis v. Riesling Grp., Inc.*, No. 9-1545, 2009 WL 3209478 (E.D. Pa. Oct. 6, 2009), *aff'd*, 398 F. App'x 793 (3d Cir. 2010) (citations omitted); *McLaughlin v. Gastrointestinal Specialists, Inc.*, 750 A.2d 283, 288 (Pa. 2000) (deciding whether the "termination threatens a clear and substantial public policy in this Commonwealth").

Plaintiff fails cogently to allege that any public policy of Pennsylvania was implicated, undermined, or violated by his purportedly constructive discharge. The Amended Complaint's supporting paragraphs for this count appear to be taken entirely from some other, unrelated case. They describe multiple "Plaintiffs," despite there being only one Plaintiff in this case, and reference a "Director's" desire to "ignore COVID-19 cleanliness standards" and "deny patients needed emergent (sic) care," which has no relevance here. Am. Compl. ¶¶ 365-70. Unsurprisingly, Plaintiff makes no attempt to explain or defend this count in his opposition brief to the motion to dismiss. Without any additional support or explanation, and with no Pennsylvania public policy implicated, Plaintiff has failed to state a claim for wrongful termination.

### D. Plaintiff fails to state a claim under § 1981 because he alleges no facts that plausibly suggest discrimination based on his racial identity.

Lastly, Plaintiff alleges a violation of 42 U.S.C. § 1981 against all Defendants, under theories of discrimination, retaliation, harassment, hostile work environment, and disparate treatment.

Section 1981 provides that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts . . . to the full and equal benefit of all laws . . . as is enjoyed by white citizens." "In employment discrimination cases, [§ 1981] claims are subject to the same analysis as discrimination claims under Title VII of the Civil Rights Act of 1964. Accordingly, a court reviews them under the burden-shifting framework outlined in *McDonnell Douglas Corp. v Green*, 411 U.S. 792 (1973). Under that framework, a plaintiff first must establish the requisite elements of his claim (called the *prima facie* elements)." *Castleberry v. STI Grp.*, 863 F.3d 259, 263 (3d Cir. 2017) (citations omitted).

Plaintiff's § 1981 claim cannot stand because the Amended Complaint makes no factual allegations that plausibly connect an action taken by any Defendant to Plaintiff's identity as an African American. To survive a motion to dismiss, Plaintiff must allege facts that "nudge [his] claims across the line from conceivable to plausible." *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 234 (3d Cir. 2008) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The Amended Complaint, however, does not allege that any Defendant ever invoked Plaintiff's racial identity, nor does it offer any allegations which if proved true could establish a hostile work environment or support an interference of discrimination. Plaintiff, in short, "advance[s] a litany of complaints without any indication that the underlying acts were racially motivated or taken out of animus" based on his racial identity. *Kumar v. New Jersey*, No. 20-13927, 2021 WL 3769280, at *9 (D.N.J. Aug. 25, 2021). As a result, his § 1981 claim cannot stand.

**IV.     Conclusion**

For the reasons set forth above, Defendants' motion to dismiss will be granted and Plaintiff's claims will be dismissed. An appropriate order follows.

<u>/s/ Gerald Austin McHugh</u>
United States District Judge